IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,635

STATE OF KANSAS,
*Appellee*,

v.

RONALD COTTRELL,
*Appellant.*

SYLLABUS BY THE COURT

1.

Multiple acts are legally and factually separate incidents that each independently satisfy the elements of the charged offense.

2.

A single conspiracy consists of one agreement, though there may be one or more overt acts committed in furtherance of that agreement. On the facts of this case, a jury instruction listing several overt acts committed in furtherance of a single conspiracy did not present multiple acts of conspiracy.

3.

Alternative means are legislatively determined, distinct, material elements of a crime, as opposed to descriptions of the material elements or of the factual circumstances that would prove the crime.

4.

A jury instruction listing more than one overt act in furtherance of a conspiracy does not create alternative means. Instead, such an instruction merely describes the factual scenarios that could prove the material element of an overt act.

Review of the judgment of the Court of Appeals in 53 Kan. App. 2d 425, 390 P.3d 44 (2017). Appeal from Sedgwick District Court; ROBB W. RUMSEY, judge. Opinion filed July 19, 2019. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, was on the brief for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: Ronald Cottrell sold prescription narcotics to an undercover detective in a QuikTrip parking lot in Sedgwick County. A jury convicted him of distributing of a controlled substance and conspiring to distribute a controlled substance. On appeal, he claims the conspiracy jury instruction, which alleged five overt acts in furtherance of the conspiracy, presented either a multiple acts or alternative means problem. He also challenges the denial of his motion for acquittal. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On June 5, 2013, Eduardo Padron, an undercover detective with the Wichita Police Department, set up a controlled drug buy from Jennifer Curtis based on a tip that she was selling prescription drugs illegally. Padron texted Curtis and asked "what kind of pills" she sold. Curtis responded, "Ok well my father is the one with the product id have to get ahold of him what ya need he has everything." Pardon requested 8 oxycodone pills

and 20 hydrocodone pills, which are prescription narcotics. Before long, Curtis texted back, "He's got yours ready when you are[.]" They decided to meet at a QuikTrip later that day, around 5 p.m.

Undercover officers conducted surveillance of the QuikTrip before Padron arrived. One officer observed several people lingering outside the QuikTrip who appeared to be watching for law enforcement, and two of them spoke with Curtis. The officer described this as "counter surveillance" activity. When Padron arrived, he parked his unmarked car in a parking lot next to the QuikTrip. The car was equipped with an interior video camera.

Padron notified Curtis of his location, but she did not approach his vehicle. Instead, she stayed near the QuikTrip and texted Padron, "Still waitin on mah pops." About 20 minutes later, a blue pickup truck arrived and parked between Padron's car and the QuikTrip. Curtis walked over to the truck and contacted the driver. As she stood beside the truck, she called Padron and asked him to relocate to the post office. Padron refused to do so, and in the background of the call, he heard a male voice say "Fuck it, let's just do it here."

At this point, Cottrell exited the driver's side of the truck, walked over to Padron's vehicle, and entered the passenger side. Inside Patron's vehicle, Cottrell exchanged a pill bottle for $350 cash. Padron's video camera captured the exchange, which lasted about 30 seconds. The video was played for the jury, but only the audio recording is included on the record on appeal. The audio is fuzzy at times, but it is clear that Cottrell introduced himself as "Randy"; said he did not usually meet people; called Curtis his "daughter"; and described the bottle as an "8 and 20." Then Cottrell returned to his truck, spoke with Curtis for a little while, and drove away. A forensic scientist later testified that the pill bottle contained 20 hydrocodone pills and 8 oxycodone pills.

3

About a week later, Padron texted Curtis about buying more oxycodone. Curtis replied, "[L]emme get with my pops how many u need?" Padron requested 10 pills. He also asked Curtis to let him know when she had the pills in her possession. But Curtis hesitated and explained, "My dad wont lemme that cuz its his business I just bring in the clientel I handle customers only no money no merch." Eventually, the second sale fell through because Curtis stopped responding to Padron's texts.

The State charged Cottrell with distribution of hydrocodone, distribution of oxycodone, and conspiracy to distribute a controlled substance. At trial, the State called three witnesses: Padron, a surveillance officer, and the forensic scientist who identified the drugs. When the State rested, defense counsel moved for judgment of acquittal, claiming the State presented insufficient evidence of the charges. The court denied the motion.

The defense called Cottrell as its only witness. He insisted that he did not know what was inside the bottle and that he blindly followed Curtis' directions because he needed the money. He explained that Curtis and his son were dating before his son's death, and after his death, Cottrell loaned her money to pay the bills. He testified that Curtis told him to come to QuikTrip to pick up the money she owed him; when he arrived, she told him to exchange the pill bottle for the money; and he naïvely complied to get his repayment.

Defense counsel asked why Cottrell called the bottle "8 and 20" in his conversation with Padron. Cottrell explained that he learned the phrase from Curtis— when he asked her what the bottle was, she said it was "8 and 20." Cottrell claimed he did not know what this meant, but he exchanged the bottle anyway because, in his words, he "got mad and thought in the split second and went, fuck it, you know." On cross-examination, the prosecutor held up the pill bottle and asked Cottrell if he could see what was inside it. Cottrell admitted that he could see pills. The prosecutor also asked if

4

Cottrell kept the money Padron gave him. Cottrell said he handed the money straight to Curtis and did not keep any of it.

Two jury instructions are relevant to this appeal. First, the charging document and the conspiracy jury instruction alleged the same five overt acts committed in furtherance of the conspiracy to distribute a controlled substance:

> "1.      JENNIFER M. CURTIS responded to Officer Padron's text inquiry with details on prices and where to go to conclude the sale of hydrocodone and oxycodone.
>
> "2.      JENNIFER M. CURTIS contacted RONALD D. COTTRELL, JR., with the sales order she obtained from Officer Padrone [*sic*] and had, RONALD D. COTTRELL, JR., appear at the designated time and place with the pills Officer Padron ordered.
>
> "3.      RONALD D. COTTRELL, JR., went to the transaction site which JENNIFER M. CURTIS had brokered between Officer Padron and RONALD D. COTTRELL, JR.
>
> "4.      JENNIFER M. CURTIS waited by RONALD D. COTTRELL, JR.'s vehicle while he went to Officer Padron's vehicle and conducted the exchange brokered by JENNIFER M. CURTIS.
>
> "5.      JENNIFER M. CURTIS met with RONALD D. COTTRELL, JR. at his vehicle after the brokered transaction with Officer Padron was completed."

Second, the culpable mental state instruction stated:  "As it relates to Distribution of a Controlled Substance, the State must prove the defendant committed the crimes *knowingly*." (Emphasis added.) At the time, Cottrell did not object to these instructions, and he even asked for "knowingly" to be listed as the culpable mental state for distribution of a controlled substance.

In the end, the jury found Cottrell guilty on all counts. At sentencing, Cottrell renewed his motion for judgment of acquittal, but the court denied it again. The Sedgwick County District Court sentenced Cottrell to a total of 68 months' imprisonment with 36 months' postrelease supervision.

On appeal, Cottrell argues: (1) The district court erred when it failed to give a unanimity instruction because the State alleged multiple overt acts in furtherance of the conspiracy; (2) alternatively, the overt acts alleged were alternative means to commit the crime of conspiracy, and the State failed to produce sufficient evidence to support each one; (3) the district court erred when it instructed the jury that "knowingly" was the culpable mental state for distribution of a controlled substance; and (4) the district court erred when it denied his motion for judgment of acquittal because the evidence was insufficient to support the charges.

The Court of Appeals affirmed, holding that no unanimity instruction was required because the allegation of several overt acts in furtherance of one conspiracy does not present a multiple acts case. *State v. Cottrell*, 53 Kan. App. 2d 425, Syl. ¶ 3, 390 P.3d 44 (2017). Similarly, the panel held that alleged overt acts committed in furtherance of one conspiracy are not alternative means requiring jury unanimity. 53 Kan. App. 2d 425, Syl. ¶ 6. Finally, the panel held that Cottrell invited any error by requesting the challenged culpable mental state instruction and the district court did not err in denying his motion for judgment of acquittal. 53 Kan. App. 2d at 436-37, 440-41. We granted Cottrell's petition to review each of these holdings.

ANALYSIS

*No unanimity instruction was required because alleging several overt acts in furtherance of one conspiracy does not present a multiple acts case.*

Cottrell claims this is a multiple acts case because the State alleged several overt acts in furtherance of the conspiracy, as reflected in the jury instruction, and thus a unanimity instruction was required to ensure the jury agreed about which overt act supported the crime. The State argues there is no multiple acts problem because it presented evidence of only one conspiracy—to sell the "8 and 20" drugs to Padron—and the overt acts supporting that conspiracy are not separate crimes.

"When several acts are alleged, any of which could constitute the crime charged, the court is presented with a multiple acts case." *State v. Bailey*, 292 Kan. 449, 458, 255 P.3d 19 (2011). In a multiple acts case,

> "'the jury must be unanimous as to which act or incident constitutes the crime. To ensure jury unanimity in multiple acts cases, courts require that either the State elect the particular criminal act upon which it will rely for conviction or that the district court instruct the jury that all jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt.'" 292 Kan. at 458 (quoting *State v. Dixon,* 289 Kan. 46, Syl. ¶ 7, 209 P.3d 675 [2009]).

Here, the State did not elect which overt act to rely on. So if Cottrell is correct that alleging several overt acts creates a multiple acts problem, then a unanimity instruction was required.

But the threshold question is whether this is a multiple acts case. To this end, we must determine "whether jurors heard evidence of multiple acts, each of which could have supported conviction on a charged crime," which is a question of law subject to

unlimited review. *State v. De La Torre*, 300 Kan. 591, 596, 331 P.3d 815 (2014). More precisely, we must determine whether a jury instruction alleging several overt acts in furtherance of a conspiracy creates a multiple acts problem and thus requires a unanimity instruction.

"'Multiple acts' are legally and factually separate incidents that independently satisfy the elements of the charged offense." 300 Kan. at 598. The charged offense at issue is conspiracy. K.S.A. 2012 Supp. 21-5302(a) states:

> "A conspiracy is an agreement with another person to commit a crime or to assist in committing a crime. No person may be convicted of a conspiracy unless an overt act in furtherance of such conspiracy is alleged and proved to have been committed by such person or by a co-conspirator."

Thus, conspiracy contains two elements: "'"(1) An agreement between two or more persons to commit or assist in committing a crime and (2) the commission by one or more of the conspirators of an overt act in furtherance of the object of the conspiracy."'" *State v. Butler*, 307 Kan. 831, 842, 416 P.3d 116 (2018) (quoting *State v. Hill*, 252 Kan. 637, 641, 847 P.2d 1267 [1993]).

As the Court of Appeals aptly said, "In a conspiracy case, it is the agreement that is the crux of the offense." *Cottrell*, 53 Kan. App. 2d at 431; see Sacharoff, *Conspiracy as Contract*, 50 U. Cal. Davis L. Rev. 405, 408 (2016) ("Sometimes the conspirators fail in their objective, or change their minds; courts still punish them because the agreement itself is the harm and deserves punishment."). Indeed, "[a] single conspiracy can last for years, with many of its substantive offenses being completed during that time" but only the single agreement may be punished. *State v. Pham*, 281 Kan. 1227, 1254, 136 P.3d 919 (2006). As we explained in *Pham*,

8

"'A single continuing conspiracy, however diverse its objects, cannot be broken down into component sub-agreements for the purpose of multiple punishments or multiple prosecutions. When separate conspiracies are alleged and both are founded on a general conspiracy statute, the relevant inquiry is whether there existed more than one *agreement* to perform an illegal act or acts.'" 281 Kan. at 1256 (quoting *State v. Mincey*, 265 Kan. 257, 268, 963 P.2d 403 [1998]).

Put simply, a single conspiracy consists of one agreement, and a defendant may only be convicted of conspiracy if the State alleges and proves that the defendant or a co-conspirator committed an overt act in furtherance of that agreement. See K.S.A. 2012 Supp. 21-5302(a); see also 15A C.J.S., Conspiracy § 146 ("The function of an overt act requirement is simply to manifest that the conspiracy is at work."). There may be one or many overt acts committed in furtherance of a single conspiracy. But a multiple acts problem requires evidence of "separate incidents that independently satisfy the elements of the charged offense." *De La Torre*, 300 Kan. at 598. For conspiracy, that means multiple acts require multiple agreements. Or, to state the same principle in reverse, no matter how many overt acts the State proved in this case, Cottrell could only ever be convicted of one conspiracy.

The State presented arguments and evidence about one agreement between Cottrell and Curtis: to illegally sell hydrocodone and oxycodone to Padron on June 5, 2013. The jury instruction on conspiracy listed that same agreement. Thus, we agree with the Court of Appeals when it held:

"[A] single agreement to commit several crimes constitutes one conspiracy. By the same reasoning, multiple agreements to commit separate crimes constitute multiple conspiracies. Here, there was only one conspiracy alleged: the distribution of controlled substances. Because none of the overt acts charged in furtherance of that conspiracy are factually and legally sufficient to constitute a crime in and of themselves, there is no risk here that the jury could have found multiple conspiracies. . . .

9

> ". . . Because the facts of this case support only one conspiracy to distribute controlled substances, a multiple acts instruction would not have been proper." *Cottrell*, 53 Kan. App. 2d at 431-32.

See *State v. Enriquez*, 46 Kan. App. 2d 765, 775-76, 266 P.3d 579 (2011) ("the overt acts of a conspiracy do not present a multiple acts situation").

*A jury instruction that lists several overt acts in furtherance of a conspiracy does not create alternative means for the crime of conspiracy.*

Cottrell argues that if the overt acts alleged in the jury instruction are not multiple acts, then they must be alternative means for the crime of conspiracy. And if the overt acts are alternative means, then the State failed to produce sufficient evidence to support each one. The State does not contest that the overt acts listed in the instruction are alternative means. Instead, the State argues that sufficient evidence supports each alternative means, and any error was harmless.

> "'In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to guilt for the single crime charged. Unanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means. In reviewing an alternative means case, a court must determine whether a rational trier of fact could have found each means of committing the crime proved beyond a reasonable doubt.'" *Bailey*, 292 Kan. at 458 (quoting *Dixon*, 289 Kan. 46, Syl. ¶ 7).

In other words, in "an alternative means case, we must conduct what we have termed a 'super-sufficiency' analysis. That is, sufficient evidence must support each of the alternative means charged to ensure that the verdict is unanimous as to guilt." *Butler*, 307 Kan. at 841.

10

As before, we begin with the threshold question:  Are the overt acts listed in the jury instruction alternative means for the crime of conspiracy? See *Butler*, 307 Kan. at 841 ("[W]e must initially consider whether the jury was ever presented with an alternative means case."). This is a question of statutory interpretation subject to unlimited review. 307 Kan. at 841. And despite the State's admission that the jury instructions presented alternative means, we will independently determine questions of law. See *State v. Hankins*, 304 Kan. 226, 232, 372 P.3d 1124 (2016) (holding that this court will not permit parties to stipulate to legal conclusions from admitted facts).

"Alternative means issues arise when the statute and any instructions that incorporate it list distinct alternatives for a material element of the crime." *State v. Sasser*, 305 Kan. 1231, 1239, 391 P.3d 698 (2017). In recent years, we clarified that "[a]lternative means are legislatively determined, distinct, material elements of a crime, as opposed to legislative descriptions of the material elements or of the factual circumstances that would prove the crime." *State v. Foster*, 298 Kan. 348, Syl. ¶ 4, 312 P.3d 364 (2013); see *State v. Brown*, 295 Kan. 181, 184, 284 P.3d 977 (2012). For example, the inherently dangerous felonies that support the charge of felony murder are alternative means. See *Bailey*, 292 Kan. at 458; K.S.A. 2018 Supp. 21-5402(c) (listing the crimes that qualify as an "inherently dangerous felony").

Recently in *Butler*, we held the plain language of the conspiracy statute does not set forth alternative means for committing an overt act. 307 Kan. at 842 (citing *Cottrell*, 53 Kan. App. 2d at 433). Thus, the *Cottrell* panel was correct on this point. But even so, this case presents a question that *Butler* declined to address:  whether a jury instruction that lists more than one overt act in furtherance of a conspiracy creates an alternative means problem.

In *Butler*, the instruction given for conspiracy to commit aggravated robbery alleged a "string of connected events" that amounted to one overt act:  "'The defendant or

11

any party to the agreement acted in furtherance of the agreement *by discussing and planning the aggravated robbery, arrived at the location, and carried out the plan.*'" 307 Kan. at 842, 844. Butler argued this instruction presented the jury with three alternative means for committing the overt act. He based this argument on two cases, *Enriquez* and *State v. Smith*, 268 Kan. 222, 993 P.2d 1213 (1999).

In *Enriquez*, the jury instruction for conspiracy to commit first-degree murder alleged three distinct overt acts, separated by the disjunctive "or":

"*a. Purchasing tools at two locations in Dodge City, Kansas; or*

"*b. Requesting additional members to be part of the plan; or*

"*c. That the defendant, Noel Trejo-Medrano, and Joel Mendoza-Soto traveled from Nebraska to Dodge City, Kansas, to put the plan into place*[.]" 46 Kan. App. 2d at 772-73.

The *Enriquez* panel held that this instruction created three alternative means for the overt act in furtherance of the conspiracy. 46 Kan. App. 2d 765, Syl. ¶ 7.

In *Smith*, "we expressed concern when a jury is given a list of possible overt acts—any of which may satisfy the overt act requirement—'a danger *could exist* that the jury was not unanimous as to the act or acts it relied upon for the conviction.'" (Emphasis added.) *Butler*, 307 Kan. at 844 (quoting *Smith*, 268 Kan. at 230). But ultimately, "we found no error where the jurors were individually polled, and the jury affirmed it was unanimous as to the particular overt act." *Butler*, 307 Kan. at 844; see *Smith*, 268 Kan. at 230.

*Butler* reasoned that *Enriquez* and *Smith* were distinguishable because in those cases the conspiracy instruction listed *several* overt acts, but in *Butler*, the instruction

12

listed a sequence of events that constituted *one* overt act. Thus, we held that the single overt act listed in the *Butler* instruction did not constitute alternative means. 307 Kan. at 843-44. In so holding, we explained that "resolving Butler's claim does not necessitate an analysis of whether *Enriquez* and *Smith* remain valid after our decision in *Brown*, 295 Kan. 181, in which we established a statutory test for determining if alternative means existed. Butler's case presents a distinguishable set of facts." 307 Kan. at 844.

Today's case presents a fact pattern like *Enriquez* and *Smith*, where the jury instruction listed more than one overt act in furtherance of the conspiracy. Thus, we must pick up where *Butler* left off and determine whether the instruction here creates alternative means for the overt act in furtherance of the conspiracy, even though the conspiracy statute does not. We note, however, that *Smith*'s cautionary comment about the possible "danger" of giving the jury "a list of possible overt acts" is not controlling— *Smith* did not rule on the merits of the question at hand. *Smith*, 268 Kan. at 230.

Recent caselaw distinguishes alternative means—which arise when a statute's plain language lists distinct alternatives for a material element of the crime—and mere descriptions of a material element or factual circumstance. When we explained this distinction in *Brown*, we noted that descriptions of an element in a jury instruction do not create alternative means:

> "The listing of alternative distinct, material elements, when incorporated into an elements instruction, creates an alternative means issue demanding super-sufficiency of the evidence. But merely describing a material element or a factual circumstance that would prove the crime does not create alternative means, *even if the description is included in a jury instruction*." (Emphasis added.) 295 Kan. at 194.

Indeed, descriptions of material elements "are secondary matters—options within a means—that do not, *even if included in a jury instruction*, raise a sufficiency issue that

13

requires a court to examine whether the option is supported by evidence." (Emphasis added.) 295 Kan. at 200.

Following *Brown*, we affirm that only the language of a statute can create alternative means for a crime. If the statute lists "alternative, distinct, material elements" of a crime, then it creates alternative means. 295 Kan. at 194. But a jury instruction that lists descriptions of how a material element might be satisfied does not, on its own, create alternative means. To hold otherwise would permit a jury instruction to override legislative intent and effectively revise the criminal code.

Thus, we affirm that the conspiracy statute does not set forth alternative means for committing an overt act. *Butler*, 307 Kan. at 842; see K.S.A. 2018 Supp. 21-5302(a). We also overrule *Enriquez* and hold that a jury instruction listing more than one overt act in furtherance of a conspiracy does not create alternative means. Instead, such an instruction merely describes the factual scenarios that could prove the material element of an overt act.

*Cottrell invited any jury instruction error.*

Next, Cottrell argues the district court erred when it instructed the jury that "knowingly" was the culpable mental state for distribution of a controlled substance. Instead, he claims the correct culpable mental state is "intentionally," based on *State v. Hall*, No. 109,602, 2014 WL 3843085 (Kan. App. 2014) (unpublished opinion). The State counters that Cottrell's argument is precluded by invited error. The Court of Appeals agreed with the State, holding that Cottrell invited any error because he "not only appears to have submitted his written requested jury instructions including knowingly as the mental state for the distribution charge but also affirmatively asked the district court to issue that instruction at the jury instruction conference." *Cottrell*, 53 Kan. App. 2d at 440-41.

14

We review alleged jury instruction errors through a multistep process. See, e.g., *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012). The first step is reviewability, a concept that includes invited error. *State v. Fleming*, 308 Kan. 689, 695, 423 P.3d 506 (2018). "Whether the invited error doctrine applies is a question of law over which this court has unlimited review." *Sasser*, 305 Kan. at 1235.

The record indicates that both parties submitted proposed jury instructions to the district court, but Cottrell's are oddly missing from the record. The record also does not show when Cottrell submitted his proposed instructions. That said, we conclude the record is sufficient to determine whether Cottrell invited any error because defense counsel discussed his proposed instruction on distribution of a controlled substance—and asked for "knowingly" to be the culpable mental state—at the jury instruction conference:

> "THE COURT:  I'm just looking at your instructions you've identified, actually in
> your instructions–
>
> "[DEFENSE COUNSEL]:  I've put intentionally as it relates to conspiracy to commit,
> and I had a typo, should be conspiracy to commit distribution of a controlled substance.
> So I specifically listed that crime, which is an intentional crime. Then down below
> knowingly, as it relates to distribution of the controlled substance, the State must prove
> the defendant committed the crimes knowingly."

Defense counsel stuck to that request throughout the jury instruction conference. In fact, only one dispute arose over the mental state for drug distribution—the parties agreed that "knowingly" was the right culpable mental state, but they disagreed where to put "knowingly" in the instructions. Defense counsel wanted to place "knowingly" within the definition of distribution of a controlled substance; the prosecutor wanted to place "knowingly" in a stand-alone culpable mental state instruction. In the end, the final instruction read:  "Knowingly:  As it relates to Distribution of a Controlled Substance, the State must prove the defendant committed the crimes knowingly. A defendant acts

15

knowingly when the defendant is aware that his conduct was reasonably certain to cause the result complained about by the State." Defense counsel said he did not object to the final instruction.

We recently clarified that

"the invited-error doctrine does not automatically apply every time a party requests an instruction at trial but then, on appeal, claims the district court erred by giving it. Instead, appellate courts must engage in a searching analysis of the facts of the case to determine whether the complaining party truly invited the error." *Fleming*, 308 Kan. at 689-90.

There is no "bright-line rule" for applying the invited error doctrine, and context matters. *Sasser*, 305 Kan. at 1235; see *Fleming*, 308 Kan. at 702 (explaining that "the nature of the error . . . and the circumstances surrounding the drafting of instructions" are critical to an invited error analysis). On the one hand, "the mere failure to object to a proposed instruction at the instructions conference does not trigger the doctrine." 308 Kan. at 702. "On the other hand, when a defendant actively pursues what is later argued to be an error, then the doctrine most certainly applies." *Sasser*, 305 Kan. at 1236. The fact that a defendant submitted a proposed instruction before trial does not prevent applying the invited error doctrine if the error "was as obvious before trial as after trial." *Fleming*, 308 Kan. at 703.

We conclude that Cottrell invited any error because he "actively pursue[d]" an instruction for distribution of a controlled substance that included a knowing culpable mental state. See *Sasser*, 305 Kan. at 1236. Cottrell was unwavering in this request, and any error "was as obvious before trial as after trial." See *Fleming*, 308 Kan. at 703. Not to mention, defense counsel stated on the record that he did not object to the final instruction. On these facts, we hold invited error precludes us from reaching the merits of Cottrell's jury instruction challenge.

16

*The district court did not err when it denied Cottrell's motion for acquittal.*

Lastly, Cottrell argues the district court erred when it denied his motion for acquittal because the State presented insufficient evidence that he (1) agreed with Curtis to distribute the controlled substances and (2) knowingly distributed them. A challenge to a denial of a motion for acquittal is, at the core, a challenge to the sufficiency of the evidence. See *State v. Raskie*, 293 Kan. 906, 919, 269 P.3d 1268 (2012). Thus, we must determine whether, in a light most favorable to the prosecution, a rational fact-finder could have found Cottrell guilty beyond a reasonable doubt. See 293 Kan. at 919-20. We do not reweigh evidence, assess witness credibility, or resolve conflicting evidence. 293 Kan. at 920.

First, Cottrell argues the State failed to prove that he agreed with Curtis to distribute drugs because it presented no evidence about his communications with Curtis about the events at QuikTrip. Indeed, the only direct evidence about their communications that day came from Cottrell's testimony, and Cottrell painted his participation in an innocent light. In effect, Cottrell claims direct evidence needed to prove the agreement occurred. But on the contrary, "[t]he agreement element of a conspiracy charge need not be proved by direct evidence; it may be supported by circumstantial evidence." *State v. Davis*, 284 Kan. 728, 737, 163 P.3d 1224 (2007); see, e.g., *State v. Morton*, 217 Kan. 642, 643, 538 P.2d 675 (1975) ("It is well established in this jurisdiction that a conviction of even the gravest offense may be sustained by circumstantial evidence."). Or, put differently, the "meeting of the minds" required for conspiracy "may be expressed or implied from the acts of the parties." *Smith*, 268 Kan. at 228. And the State presented sufficient circumstantial evidence that Cottrell agreed with Curtis to distribute the drugs.

For example, Curtis texted Padron that her father was the one with the product; that she was waiting on him to complete the transaction; that she brought in the clientele

but he ran the business. These texts suggest that Cottrell ran an illegal drug business with Curtis' assistance, and the two worked together to complete the sale to Padron. But Cottrell's actions speak loudly as well. At QuikTrip, officers observed Cottrell speak with Curtis directly before and after the sale. Cottrell personally exchanged the pill bottle for cash, which was caught on video. And finally, Cottrell described the pill bottle as an "8 and 20" and referenced his "daughter" during the exchange, suggesting the two coordinated the sale together. Viewed in a light most favorable to the State, this evidence is sufficient to prove that Cottrell agreed with Curtis to distribute the drugs.

Second, Cottrell argues that he did not knowingly distribute controlled substances. In support, he points to his own testimony that he did not understand what was happening and did not know what was in the bottle. We assume without deciding that knowingly is the required culpable mental state for this crime. And in the context of controlled substances, we have recently clarified that a knowing culpable mental state can be disproved if a mistake of fact is shown. *State v. Rizal*, 309 Kan. __, __ P.3d __ (No. 114,635, this day decided), slip op. at 12 (holding "a mistake of fact about the nature of a controlled substance—meaning the actual belief that it is 'some other lawful substance' that is not controlled, *Rosa*, 304 Kan. at 437—could negate the knowledge requirement").

Essentially, Cottrell argues the jury should have given his testimony—that he did not know what was in the bottle or that it contained a controlled substance—more credibility and discounted the significant circumstantial evidence against him. But, of course, we do not reweigh credibility. *Raskie*, 293 Kan. at 920. And the circumstantial evidence supporting his knowledge that he was distributing controlled substances was significant. For instance, Curtis' texts about the quantity of drugs and her father's involvement in the sale, combined with Cottrell's comment to Padron about the "8 and 20" bottle, suggest that Cottrell understood the sale involved a controlled substance. Not to mention, a reasonable juror could find that Cottrell's story was farfetched, to say the least—that he blindly exchanged a pill bottle (called an "8 and 20")

18

for cash in a stranger's car at a gas station and had no idea the bottle contained illicit drugs. Given this, a reasonable jury could have weighed the conflicting testimonies and found the knowledge requirement met beyond a reasonable doubt.

Affirmed.